and the Cững T哼 Corporation of the United States and Vietnam. The next argued case is number 19, 1561, ICCS, USA, against the United States. Mr. Pollack. Good morning. May it please the court. My name is Elon Pollack. I represent ICCS, the appellant in this matter. This case, we believe that the court below should be reversed because of a finding of fact that's inconsistent with the facts of record. The case really stems from four different concepts, one of which is brand, one is model, one is product designation, and one is product. Beginning about page 4 of the court's opinion below, I believe it's appendix page 4, the court agrees with the parties that the product is the premium brand. About two pages later, the court morphs into a finding that the product is now a model as opposed to a brand. A model doesn't appear anywhere in the correlation sheet that's produced by an underwriter's laboratory, but yet that becomes the focus for the court's decision that this is a new product, a new model, and hence it required approval before it was imported. That's simply not the case. OJC, which is the producer and supplier of the premium brand product, applied for license with UL in 2001. That license allowed them to bring in a product that they designated as the Mega One. The Mega One product is still the same product that's imported today. There's no change. It's the same product designation supplied by OJC. Since that time, underwriter's laboratory has approved that application of its registered trademark to the canisters that were being imported. The only dispute really is whether the brand name supplied by the multiple listee under the original license changes anything. Our position has been all along that there's no change. It's still the Mega One canister. Nothing has changed at all. Because it's still the Mega One canister, the authorization to import this product with the UL listing on it meets all of UL's requirements and that the statements that the government relies on from underwriter's laboratory product brand manager are both misleading and a misrepresentation when she says at page 401 in the authorized model on that date was butane gas canister model number U.S. butane. On February 8th, five new model nomenclatures were added to the private labeling for file MH61112, which included the model number premium. That's simply untrue. It's simply untrue. These are not new models. They're the exact same model that was used, the same product that was authorized by UL going back to 2001. Part of our appeal concerned the abuse of discretion by the court below not to allow us to conduct discovery. This is precisely the problem, is that we would like to have known what the basis for that statement is. Because in the absence of an explanation, it's an empty statement with no contradiction whatsoever and not supported by the other underwriter laboratory's documentation. I want to point out to the court that the only model reference that they supply appears at pages 201 through 205 when it talks about the product covered and describes the model as the mega one or the mega one UL. Each and every page of their report stating from 2001 through 2016 say the same thing. The only model is the mega one. Not any U.S. butane, premium, or any of the other brands provided by the multiple list D. And on that basis... I couldn't tell. How did this arise with this question of counterfeit? Did UL complain? Actually, Customs stopped the shipment. Yes, that's what you told me. They stopped the shipment and then released it. Was there a complainant or was this... No, not at all. Customs stopped the shipment because UL's registration is listed, is recorded with U.S. Customs. But did UL complain about the use of premium? No. No, this was provided by Customs when they detained the goods. After five days, they notify UL and ask UL to confirm or deny whether this product is authorized. What did they do? They denied. They said it's not authorized. And the basis is... Because of the premium designation? Yes, ma'am. Exactly. And what we suggest in our papers is that either Emma Pierce, who was the responsible official at UL, was guessing or she never looked at the record because the record is very clear that the product designation covered by the license is Mega One and that the multiple list D's product designation has nothing to do with the underlying license that's been granted by UL. This is a trademark question and the trademark rights were granted by UL to OJC to apply the UL mark to its Mega One product. Did the premium products that were brought into the country include the Mega One designation? Actually, it doesn't say that. It has the control number on it, which is 47VN. So I asked because it's my understanding that the subject merchandise only designated Mega One was approved and certified by UL. So was it designated Mega One? I'll answer that question this way. Not on the papers and not on the product because UL approved the control number of 47VN. In fact, Emma Pierce in page 401 says that it complies. But what you're asking for would create an unreasonable burden on customs because you're is a list of products that have been designated and it was designated Mega One that was approved. You're asking customs to somehow do its own actual comparison to ascertain whether there are any differences between the product being imported and the product which was approved as opposed to simply relying on the designation either on the paperwork or on the product itself. That's exactly the point of the protest and the 30-day detention period that occurs after the goods come in. Remember, this merchandise was released to the importer and it was only after customs issued the redelivery notice that the importer responded through its protest to say this is an authorized product. Here are the licensed documents. Isn't customs' obligation to and shouldn't be to have to look at these two products beyond simply how they are designated to ascertain whether they have any discrepant characteristics and therefore aren't exactly the same. And you seem to want to place that burden on customs. Customs has a list of what has been approved by UL for designation and this premium wasn't on the list because it doesn't have any Mega One designation to it. And when customs went to UL and said, hey, is this approved? Are we missing something? They said, no, it's not. So I just baffled by how with those set of facts, you could think nonetheless something more or different was required of customs. The point is that UL created the license with OJC and Emma Pierce states clearly that the labeling... Then maybe you have a clause of action against UL for the manner in they responded if you believe they were improper in their response. But I don't see how customs or the CIT erred given that it did not have a designation, that the product did not have a Mega One designation anywhere on it. And UL responded that, no, this is not authorized. So with those facts, I don't see why you're in this court arguing that customs erred. If you want to argue that UL breached its license with you by stopping these goods at importation, then you're free to do that. But that can't be part of this litigation. I disagree with you for the following reason. Is that we're talking about two separate events. One is a claim that we have ICCS or OJC may have against UL. But also remember the government seized the property and one part of the property. And the other instance is where they ordered it to be redelivered as the mark was counterfeit. And this is a trademark case and the mark is not counterfeit because UL approved that product. So whether it's a certification mark case, to be precise. It's a certification mark case, to be precise. And UL approved that certification for that mark. If you look at Emma Pierce's statement. But yet they said they didn't. And there's nothing a product with the label of what was actually approved. But in fact, Emma Pierce says in her report on page 401 that the mark that appears on page 45 is accurate. She says that. This is one of the reasons why we were complaining about the lack of discovery. Because on the one hand, she's saying that the label that appears in appendix 45 is approved. Not for the premium brand. There's no brand listed. There's no brand listed here. This is a certification mark by UL. It doesn't say premium. It doesn't say mega. It doesn't say U.S. butane. Those are designations by the multiple listee. It's not required to be there. This is what's required to be there. And UL confirmed that it's required to be there. You had an online. There's an online directory. It's difficult to access it these days. I think since this case came up. And the online directory didn't have the premium. Not at the time. But that's because it's the multiple listee's designation. It's not the basic applicants. It wasn't on the multiple listee's designation sheet either. Yes, but the point is that the authorization to use the mark comes from OJC's application and approval by UL. And that's there on the correlation sheet. It indicates it right there in the second column. There are four columns. In the second column it says that. Mega one is approved. And that's the same product. Not the multiple listee's designation. The multiple listee designation was for U.S. butane, right? That was at the time, yes. At the date of importation. Now it's U.S. butane and premium. And others. Because UL finally got to review the premium. Actually what happened was that our client submitted an online application on day one and the next day it was added. There's no additional certification. There's no additional testing. There's no nothing. They just simply added the names. As I understand the trade court's position, the trade court was saying that this is really more UL's domain that gets to decide which products, which brands get to have their UL certification mark. And so it's not up to the importer to decide I want to use a different brand name for this old product. And so now I'm just going to import it with a brand new brand name. I understand what the court was saying, but that's inaccurate because it only applies if there's a change in the product. Doesn't UL get to decide? Let me finish. I'm sorry sir. Doesn't UL get the chance to police the usage of its own mark? I mean if that's the concern here is that we can't, it can't tolerate allowing importers, licensees, whatever from choosing to unilaterally elect to slap the UL mark on its products and decide for itself, oh this is just a superficial difference between the previously approved usage of UL's mark by UL. And so therefore I can just keep on going with using UL's mark on this additional line of products that I'm now importing. I think that's the concern. I understand what the court below said and I understand your concern. But that rule, that language that the court cites only applies if there's an addition or deletion or revision to the product. And here there's been no change to the product. That's why UL has an exception to its contract that says if it's a change in the product designation, there's no requirement. In fact, you could import the product with no name on it and it would be authorized. You don't have to have a name. How's customs going to get through that? The point is they would go to UL and they would say that is this 47VN an authorized product? And they'd come back and say yes, it's OJC's and it's for the Mega One. That's exactly the point because the trademark rights come from the contract with OJC and with UL, not based on the multiplicity's marketing tool. And that's really what this is about. When the court below, they mashed up all the terms. UL has specific terms for how to interpret their contracts. They have product, product designation, and multiplicity's product designation. So is it correct that the only difference from what UL had seen before was putting premium on a container? That's correct. That's correct. That's the only difference. I've basically used up my time. I'd like to reserve a few minutes. We'll save you rebuttal. Let's hear from the other side. Ms. Schuchman. Good morning. May it please the court. My name is Jamie Schuchman and I represent the United States, the appellee in this case. This case is about a narrow issue and that is whether ICCS was authorized to use UL's mark on the goods at issue at the time of importation. The trial court correctly interpreted the relevant... UL's mark was on the container. The same question I just asked counsel. The only difference was that they also had the word premium on the container. Is that right? Your Honor, I do. But what's critical here is that UL did not make the determination that the only difference was the existence of premium. But at least they say in their briefs, you could have all sorts of changes in the labeling of the container. You could have a different owner. You could have a different this or that as long as the content is as certified. Your Honor... When you call something premium, grade doesn't say that there's anything significant or does it? In this case, it is not, Your Honor. But what's important here is that UL must make that determination. Here it ultimately did. There wasn't a difference between the premium model and the underlying product. But in the next case, there could be a difference. And what is important here is that that determination came after the time of importation. So at the time of importation, customs didn't know, it wasn't clear if the premium brand was the same as the underlying basic product. And that is why the mark at issue was counterfeit. A counterfeit mark, which is defined in the Lanham Act, is a mark that is... How could it be counterfeit to put a premium to say this is quality stuff? It's counterfeit because it is spurious, which means that it is false. It falsely implies that UL has given its stamp of approval to the premium brand of product. UL ultimately did. Even though it's the same product and it's a little bit of advertising puffery. It's, once again, the contracts state that it's for UL to determine what the premium product designation means. So the prior product that was expressly authorized by UL, what was the name of that product? So what's important to understand here is that there is a product designation for the basic product. That is the product that was manufactured by OJC. That's MEGA-1. That is MEGA-1. That is the product designation for the basic product. Then there was something else called U.S. Butane. Yes. So then there is a product designation for the importer. You can have different models that are used on the same basic product. So the basic product has never changed. We all agree to that. But the models change. And under the terms of the contract, ICCS has to make a request to UL each time it wants to use a different model. In this case, the goods at issue had a premium model on it. And when UL receives a request... I mean, when you say premium model, I mean, I'm just trying to understand what we're talking about. Customs was used to seeing something that said U.S. Butane. Correct. And then with this shipment of butane gas canisters, it didn't see U.S. Butane there. It saw premium. Yes, Your Honor. Was that like a sticker that was slapped on the side of the canister? Or what was it that Customs sees... What does it look at when it sees U.S. Butane versus sees the word premium in this instance? It sees the imported product. And along the side of the butane gas canister is a label that has the words premium. And that was a label that Customs hadn't seen before. Did it say U.S. Butane premium? It did not. It said premium, and then it had UL's certification mark, the UL in a circle. So the goods that swapped the words out exchanged U.S. Butane for premium. Yes, we now know that this was simply swapping the words out, that UL ultimately agreed that the premium model was the same basic product as the U.S. Butane model. But what is important in this case is we didn't know that at the time of importation. Customs didn't know that, and UL hadn't made that determination. So the use of the UL mark on the premium brands at the time of importation falsely implied that UL had already approved the use of its certification mark on the premium brands at issue. That false nature of the brand is what renders it spurious, and it's what renders it counterfeit under 15 U.S.C. 1127. And the relevant legal framework here authorizes customs to seize goods in order to enforce a trademark owner's rights, and that's exactly what it did in this case. Are importers told don't make any change on the outside of anything you import that UL has certified? I mean, this seems very mysterious. Here there was an established business with people in charge of looking into the mechanics of coping with importation, and they decide that this is good. They're just going to have a little bit of advertising on the outside of their can. So they put on a premium sticker, and all of a sudden it's mysterious. And in terms of the obligation of customs in a circumstance such as this is, I suppose, the question before us. But recalling, and I don't know what happens to the stuff that's been recalled. Is it re-exported or trashed or what? Well, in this case the goods at issue were not seized because they had already entered the stream of commerce. So customs requested re-delivery, and it was not able to seize the goods because they couldn't be re-delivered. But to return to your honor's previous point, UL doesn't consider the branding of these products merely puffery. It isn't mysterious how to handle this branding. It's laid out very clearly in the terms of the party's contracts, and that was what the trial court correctly analyzed here. The contracts require, and I'm referring to the service terms which are at appendix 264, that ICCS make a request in writing whenever it wants to add a different product designation, in this case a different model, to its multiple listing. And ICCS has to have express authorization from UL every time it wants to use a different model. UL then is in the process of determining whether that model comports with the basic product. Well, but your opponent's argument is that this wasn't a different model. This was the same model, it just had a different label on it. So what happens under those circumstances? I disagree with that assertion. UL in fact uses the word model. We can look to the mark verification report, which is at appendix 401, where UL states that the premium brand was a different model, and that model was not approved at the time of importation. And if we look to the service terms... And so would your position be, it's not for customs to try to go behind the mark holder to figure out whether or not it's really the same model with all the exact same features, when it does have a different name branded on it, that it's reasonable for customs to rely on UL answering those questions? Yes, Your Honor, it is reasonable and customs here relied on the entry paperwork and the online certification directory. But it's also worth noting that customs gave UL not one, but two opportunities to confirm whether or not ICCS was authorized to use its mark on the goods at issue at the time of importation. The first time was after ICCS protested customs request for redelivery. Prior to denying that protest, customs reached out to the trademark owner, as is contemplated in the relevant legal framework, to ask whether or not the mark at issue was counterfeit. And at that time, UL said, yes it is, and our authorization is not retroactive. Then once again in this litigation, we actually asked the trial court for more time in answering ICCS's complaint to give ICCS another opportunity to go back to UL and ask if they would retroactively approve its use of UL's mark on the goods at issue at the time of importation. And UL said unequivocally it would not grant retroactive authorization. It has a strict zero tolerance policy to uphold its reputation and to uphold the integrity of its brand. And it stated on both occasions that it does not authorize any retroactive use of its mark. And that goes back to the point that I was making earlier. This is not merely puffery. This is not something that UL takes lightly. This is central to what UL does when it puts its name, its certification mark, on a product that indicates that UL has certified and approved. But it was the same product. Yes. This really isn't that significant. It was the same product. I could appreciate perhaps some agency saying we're not going to retroactively authorize a different product, however different, but it's the same product. All they did was put a different container. Your Honor is correct, but what is critical to this case is that we didn't know that at the time of importation. They were told this is the same product. This is our standard butane disposable containers. We've just added premium. But the different marks is critical. That's critical to what UL does. That's why it maintains it online. Premium isn't a mark. It's a grade. It's not a mark. It's advertising. That mark represents more than advertising. Here, the use of UL's mark means that it has tested and certified the quality and accuracy of the product that is coming into the country. Here, butane gas canisters. While it ultimately determined that the premium brand was consistent with the product that it had certified and tested, it hadn't made that consistent. It's the same. Everything that I could see in the briefs, that it was the same product that they've been importing all along. The parties agree that the underlying basic product was the same, but the entire purpose of the multiple listing agreement and the service terms that are at issue is to determine which brands, which models, ICCS can use the UL certification mark on. It's not a different model. I don't have any problem with customs looking into something that seems to be different, but the penalty here imposed seems to me to be extraordinary. Your Honor, customs followed the legal requirements, which here ultimately leave it to the trademark holder to determine the disposition of products that customs determines bear a counterfeit mark. 19 U.S.C. 1526E contemplates a multi-step process for determining what to do if customs finds that goods bear a counterfeit mark. First, customs seizes the good, and then it reaches out to the trademark owner to see if the owner will consent to the release of these goods. That is the legal framework that we're operating in. I guess for the trade court to have gone the other way here, it would have had to essentially overturn what UL indicated when UL said that this is a false spurious usage of its own mark on these imported goods. Yes, Your Honor. And then, therefore, the trade court would have had to say, well, the trademark owner is telling me that it didn't authorize this usage of its trademark, but I disagree with the trademark owner's position on this alleged misuse of its own trademark. Yes, Your Honor. And 19 U.S.C. 1526E explicitly leaves it to the trademark owner to consent or not consent to whether goods bearing their mark come into the country. The trademark owner is the party that decides the scope of a licensee's right to use its marks. And here, there is no dispute that at the time of importation, ICCS was not authorized to use UL's mark on the goods at issue. And as the trial court correctly determined, while we can infer that in this case the premium brand was a superficial designation, that the underlying product didn't differ, the contract terms that govern the relationship between ICCS and UL leave that determination to UL. And UL had not had the to make that determination prior to the time of importation. The use of their mark on the premium brands falsely implied that they had made that determination. Well, but all right, so let's look at the penalty. So they were asked to return the product, so they returned that which hadn't moved into commerce. Yes, Your Honor. And they were then charged a penalty for everything that they had done. Now, Customs changed its mind. Isn't that a curious retroactive activity, that what they did when even in accordance with what Customs had said, nonetheless, in retrospect, now pay up? Your Honor, the damages in this case are because ICCS could not redeliver the goods at issue. And while it may be a harsh penalty, ICCS did not comply with the terms of the contract. UL stated very clearly in the contract that it must request in writing. But this activity took place before anybody had said that there was some flaw in the interaction with UL, whatever that was. Your Honor is correct. And that may go to whether or not there was harm in this case. But making that determination isn't necessary in order to determine that the goods at issue had a counterfeit mark at the time of importation. Nobody said it was found that it was counterfeit. They hadn't, as far as to try and understand UL's response, no, we're not going to test it again to make sure that it's the same product, which I assume they were told. I don't understand their reaction, but we have whatever they did. But now we look at Customs' response. And nobody ever said it was counterfeit. Nothing wrong. This is the same importer who had said he was importing was a premium brand was now added, I suppose, by sticker on the container. The counterfeit aspect would have been the use of UL, not premium. Isn't that right? The counterfeit aspect is that ICCS used UL's certification mark on a brand of product that it wasn't authorized to use it on. And to be clear about the facts, UL did call it a counterfeit mark, correct? Because they responded by saying this is not authorized to have our mark. And that pretty much, I think, is the definition of what a counterfeit use would be. Exactly, Your Honor. UL said this at the time that Customs contacted them when it was looking into the protest, prior to denying the protest. And UL said the exact same thing in this litigation when we gave ICCS time to once again reach out to UL and see if they would retroactively approve the use of its mark. It wouldn't be counterfeit for ICCS to use UL's certification mark on premium products today, but it was at the time of importation because it hadn't followed the steps for adding that brand to its multiple listing as is contemplated by the contracts at issue. Okay. Anything else? Good. Thank you. Thank you, Your Honor. Mr. Pollack? Just a few points. First, I'd like to apologize to Judge Chen for interrupting. It's not something I do every day. But the fact is, and I think, Judge Newman, you focused in on this, the product remained the same. The label, the branding is the only thing that's different. UL approved the product. In fact, the language that the government quoted right now says, use of names and marks. The master list services shall not result in the contracting party issuing a product safety certification or other authorization to use the mark apart from the basic product authorization. That's the same. It didn't change. It's still the Mega One brand. It's still the Mega One product that was approved, product designation approved by UL back in 2001. Nothing changed. The government continues to state that these are different models. They're not different models. The word model doesn't even appear on the correlation sheet. There's no such designation as a model. There's a product designation by a multiple listing. There's a product designation by the original applicant. And then there's a general description of the product that's involved in the certification. The term model never shows up. The word brand never shows up. And there's nothing in the record to support the statement that this is a new model. Just to clarify, in your prior imports, when they came in and customs looked at them, they would see the words U.S. butane, right? I would be guessing to say that that was the name that was listed on the certification, on the original correlation sheet. And this time around, U.S. butane wasn't there, but the word premium was there. Yep, that's correct. That's the only difference. I think Judge Newman focused in on the problem. And are these words U.S. butane versus premium, are they used as basically the names of the product? No, it's advertising. Premium is an adjective. Well, maybe, but I'm just trying to understand the words Mega One, U.S. butane, premium. How are these words being used? Are they being used as the names that you would prefer to the underlying good, the underlying merchandise? Here's our Mega One canister. Here's our U.S. butane canister. Here's our premium canister. As far as I know, I don't think OJC ever used Mega One on its product. I don't know. But I think that originally they indicated that they used U.S. butane. And as many of the people in the customs field know, if you put U.S. on a product, it triggers different requirements under 19 U.S.C. 1304 that requires country of origin marking and the same size lettering. So there may have been a problem putting U.S. on that canister. So to me, as a customs practitioner, I know that I would have recommended to the client to take the U.S. off because it could trigger relabeling of every canister. So different problem. But there's something I'd like to point out. Council notes that ultimately UL agreed that the product was authorized when they changed the correlation sheet the following day after the application was submitted. But they didn't agree it was authorized the day before. They added that brand to the multiple listies product designation the day after. They agreed it was authorized as of the day they approved it. But they explicitly indicated it was not authorized retroactively, which means they argued to customs it was not authorized prior to their review. Well, Your Honor, I would disagree on the following basis. Two reasons. Number one, under the customs regulations 19 CFR 133, I think it's either 22 or 23, there's a savings provision that says after a redelivery or detention, if you obtain the approval of the trademark owner, then the goods are authorized to come in. UL added the name the day later, well within the 30-day period after the notice of So I would submit that that satisfies the requirement that 19 CFR 133, I would say 22 or 23. Is that cited in your briefs to us? I beg your pardon? Is that cited in your briefs? I don't think so. Yeah, I don't think that argument was made. But another point is that is to paraphrase Judge Moore, trademark rights stem from use. By analogy, trademark rights here stem from the use by OJC of the UL logo on its original Mega One product. Nothing changed. And all the trademark rights, if you look at the actual labeling, it says UL listed. That's all it is, is the canister is UL listed, and it gives the control number that's supplied by UL. It's still the same. Nothing changed. I don't think it's, to answer, to respond to what you said, Judge Newman, I don't think it's mysterious. UL wants to have a right-line rule. It's on the list, or it's off the list. And that's all they want to look at. They don't want to look at any of the underlying terms and conditions of, apparently, Emma Pierce never looked at the underlying terms and conditions of her own contract. Because, as I just pointed out, OJC was authorized to put that mark on that product, since 2001, and nothing changed. We request that the court reverse the decision of the court below. Thank you. Any other questions? No. Okay. Thank you. Thank you both. The case is under submission.